IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

J. TODD CHRISTIAN, PATRICK GERWITZ, )
TIMOTHY McCARTHY, JOHN BRIDGES, )
And MIDLAND PAPER COMPANY, )
                                                               )    No. 3:14-cv-00858-DRH-SCW
                 Plaintiffs, )
                                    )    Honorable David R. Herndon
   v. )
 )
VERITIV CORPORATION, )
 )
               Defendant. )
 )
VERITIV CORPORATION and XPEDX, LLC, )
 )
        Counterclaim/Third Party )
             Plaintiffs, )
 )
   v. )
 )
J. TODD CHRISTIAN, PATRICK GERWITZ, )
TIMOTHY McCARTHY, JOHN BRIDGES, )
CAROLYN HUNT, MICHAEL GRAVES, and )
MIDLAND PAPER COMPANY, )
 )
       Counterclaim/Third Party )
            Defendants. )
_____)

**MEMORANDUM AND ORDER**

    **I.**    *Introduction*

This matter is before the Court on Counterclaim / Third Party Plaintiffs' Motion for Preliminary Injunction (Doc. 23), seeking to enforce the terms of the noncompetition agreements of J. Todd Christian, Patrick Gerwitz, Timothy McCarthy, John Bridges and Carolyn Hunt.

Page **1** of 13

Plaintiffs filed a declaratory judgment against Defendant Veritiv Corporation ("Veritiv") in St. Clair Circuit County Court, IL seeking a judgment that noncompetition agreements between Veritiv and Christian, Gerwitz, McCarthy and Bridges, respectively, are unenforceable, and that Midland Paper Company ("Midland") did not tortiously interfere with the Veritiv noncompetition agreements by hiring these individuals. (Doc. 5-1.) Veritiv removed the case to this Court on August 12, 2014, on the basis of diversity. (Doc. 5.)

Concurrently, Veritiv's subsidiary, xpedx, LLC, brought a separate suit against Plaintiffs and Carolyn Hunt and Michael Graves (Midland's President), in the Circuit Court of St. Louis County, Missouri, alleging various claims, including breach of the individuals' noncompetition agreements for accepting employment with Midland and soliciting sales from customers they had solicited on behalf of xpedx, LLC prior to resigning, and related tort claims against Midland and Graves, among other things. On July 30, 2014, xpedx, LLC filed a motion for a temporary restraining order against the defendants in its Missouri action, and on August 1, 2014, the Missouri court awarded xpedx, LLC, a Temporary Restraining Order. (Doc. 36-1.) The Missouri court also entered an order directing the parties to engage in expedited discovery and setting a preliminary injunction hearing for September 12, 2014. On September 10, 2014, xpedx, LLC abruptly cancelled the Missouri preliminary injunction hearing, and advised that

it planned to allow the TRO to expire September 12th. The Missouri court unconditionally dissolved the TRO on September 12, 2014. (Doc. 36-4.)

On September 15, 2014, xpedx, LLC filed a Third Party Complaint against Plaintiffs and Carolyn Hunt and Michael Graves (together, "Counterclaim / Third Party Defendants"), and Veritiv counterclaimed in this Court against Counterclaim / Third Party Defendants, alleging breach of contract, breach of duty of loyalty, tortious interference with contract, misappropriation of trade secrets, civil conspiracy, and unfair competition. Also on September 15th, xpedx, LLC voluntarily dismissed its Missouri action.

On September 23, 2014, Veritiv and xpedx, LLC ("Counterclaim / Third Party Plaintiffs") filed a motion for preliminary injunction against the Counterclaim / Third Party Defendants. (Doc. 23.) On November 13, 2014, the Court held a hearing on the motion. After hearing arguments and reviewing the evidence submitted by parties, which included deposition testimony and declarations from customers, suppliers and the parties, the Court DENIED Counterclaim / Third Party Plaintiffs' motion for preliminary injunction. The Court now formalizes and memorializes the findings it made at the November 13, 2014 hearing in denying Counterclaim / Third Party Plaintiffs' motion.

## II. Findings of Fact

1. Through a series of legal transactions, International Paper ("IP") spun off its "xpedx" division, which distributes packaging, facility and paper supplies. As a result, an entity, xpedx, LLC, merged with Unisource Worldwide, Inc.,

another distributor, to become Veritiv. The newly formed company, Veritiv, has approximately 9,500 employees working at 170 distribution centers throughout North America. The counterclaim and third-party claims at issue here relate to noncompetition agreements signed by Counterclaim / Third Party Defendants while employees of IP.

2. Christian, Bridges, Gerwitz, and McCarthy are sales representatives who primarily sell printing paper and some packaging products. Hunt worked for Veritiv/xpedx as a secretary, and served as the customer service representative for one account. The employees resigned from Counterclaim / Third Party Defendants on July 21, 2014 to join Midland. Counterclaim / Third Party Defendants informed their former employer of their intentions to work for a competitor, and their belief that the noncompetition agreements they signed while employees of IP were invalid. At the same time, Christian, Bridges, McCarthy, Gerwitz and Hunt each returned all their former employer's property, information and data in their possession, and they since have not used or disclosed their former employer's information on behalf of Midland or any other party.

3. The paper and packaging distribution business is a commodity market, and customers are readily identified through public sources, print shop conferences, LinkedIn, other Internet databases, and common knowledge.

Counterclaim / Third Party Defendants' management assigned sales representatives to specific customers to prevent overlap; and all the customers were in the St. Louis metropolitan area (or the Springfield, IL area, in the case of Tim McCarthy).

4. The paper and packaging supplies distribution business is a commodity trade where there is no differentiation among competing product categories. Neither Midland, xpedx, Veritiv nor any other distributor in this industry manufactures or designs the paper or packaging materials they offer for sale. Sales are principally price-driven, and it is common for longstanding customers of Counterclaim / Third Party Defendants to buy products from competitors quoting lower prices or more favorable terms.  There is no exclusivity in this industry between customers and distributors, as customers typically use multiple distributors to fulfill their paper and packaging needs. In some instances, customers have relationships with five to ten different salespersons, each employed by a competing distributor.

5. The different paper or packaging brands offered by the distributors are fungible, and sales depend on meeting the customer's requirements, in terms of pricing, volume and schedule. (Doc. 49.)

6. In order to encourage price competition, customers routinely disclose prices offered by competing distributors, purchasing and order histories, and credit terms. (Doc. 49-6 to Doc. 49-10.) xpedx, Veritiv and its competitors also widely distribute price information and product books, which are not subject to any confidentiality or nondisclosure restrictions. In fact, one Veritiv/xpedx salesman, Bill Cunningham, admitted to having a Midland price book in his office. (Doc. 49-15.) Finally, customers do not sign non-disclosure agreements paper and packaging distribution companies and are free to provide information supplied by Veritiv/xpedx to anyone.

7. On the supply side of this business, paper mills and packaging supplies manufacturers produce and distribute their products through distributors such as xpedx, Veritiv and Midland. (Docs. 49-11, 49-12.) The paper mills and packaging supplies manufacturers provide the same pricing and other terms for their products to competing distributors seeking sales to the same end use customers. Further, neither the paper mills nor the packaging supplies manufacturers impose any confidentiality restrictions on their respective pricing and other terms disclosed to the distributors. *Id*. Moreover, the pricing on products produced by the paper mills and suppliers fluctuates frequently.

### III. Conclusions of Law

1. The Court relies upon all of the facts recited in its findings of facts when making its conclusion of law that law applies to those facts.

2. A party seeking a preliminary injunction to enforce a restrictive covenant must show: (1) no adequate remedy at law exists; (2) he will suffer irreparable harm if the injunction is not granted; (3) he has a reasonable likelihood of success on the merits of the underlying claim; (4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the injunction is granted; and (5) the injunction will not harm the public interest. *Jones v. Butler*, 2014 WL 3734482, at *3 (S.D. Ill. July 29, 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Peckham v. Metal Management, Inc.*, No. 10–cv–183–DRH, 2010 WL 1838060, *2 (S.D. Ill. May 5, 2010).

3. The Court finds Counterclaim / Third Party Plaintiffs failed to show it will suffer irreparable harm if the preliminary injunction is not granted. Counterclaim / Third Party Plaintiffs' contention that it faces irreparable harm absent issuance of injunctive relief is contradicted by its unilateral decision to unconditionally abandon the TRO they secured in the Missouri action and dismiss that action without any effort to amend the Missouri

complaint to address the issues related to facts establishing that the noncompetition agreements were assigned to Veritiv, and not xpedx, as previously alleged. The Counterclaim / Third Party Plaintiffs' choice to abandon the TRO serves as a concession that they do not face irreparable harm.

4. Separately, Counterclaim / Third Party Plaintiffs' motion for a preliminary injunction fails because Counterclaim / Third Party Plaintiffs are not likely to succeed on the merits of its underlying claims. The Court finds there is no protectable interests in this case. The noncompetition agreements' choice-of-law provision is indecisive, stating the agreements "shall be subject to and governed by the laws of the State of Missouri *or* any other Court of competent jurisdiction, having a significant relationship to the subject matter of th[e] Agreement." (Doc. 5-1 at 35, 42, 49, 55; Doc. 18-1 at 6.) (emphasis added). Yet, the Court finds the noncompetition agreements are governed by Missouri law because of the contacts that are involved.

5. Under Missouri law, "[c]ovenants not to compete are presumptively void." *Victoria's Secret Stores, Inc. v. May Dep't Stores Co.*, 157 S.W.3d 256, 260 (Mo. Ct. App. 2004). As the Missouri Supreme Court has emphasized, "employees have a legitimate interest in having mobility between employers to provide for their families and advance their careers." *Whelan Sec. Co. v.*

*Kennebrew*, 379 S.W.3d 835, 841 (Mo. banc 2012). Thus, a restrictive covenant is presumptively void and is enforceable only "if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Id.*

6. "[N]on-compete restrictions are enforceable only to protect" two "narrowly-defined and well-recognized interests" recognized by Missouri law: "customer contacts and trade secrets." *Brown v. Rollet Bros. Trucking Co.*, 291 S.W.3d 766, 773 (Mo. Ct. App. 2009). Only to the extent that they "protect against unfair competitive use of either customer contacts or trade secrets" are restrictive covenants valid. *Id.* An employer seeking to enforce a restrictive covenant "has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." *Whelan*, 379 S.W.3d at 842.

7. The Court finds the Counterclaim / Third Party Defendants have failed to carry their burden of demonstrating the existence of protectable interests justifying the scope of the restrictive covenants here. Counterclaim/Third Party Defendants claim the goodwill it allegedly developed with its customers is a sufficient protectable interest to justify the noncompetition agreements here. The Court disagrees because under Missouri law, a

restrictive covenant can be justified by an interest in customer contacts only "to the extent it seeks to protect against the influence an employee acquires over his employer's customers through personal contact." *Whelan*, 379 S.W.3d at 842 (internal quotation marks omitted). The reason "for protecting 'customer contacts' is that, in the sales industry, a customer's goodwill toward a company" may be "attached to the employer's individual sales representative," which means that the employee may be "in a position to exert a special influence over the customer and entice that customer's business away from the employer." *Systematic Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 51 (Mo. Ct. App. 2005). Thus "[t]he quality, frequency, and duration of an employee's exposure to an employer's customers are crucial in determining the covenant's reasonableness." *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. 2006) (en banc). And to render the covenant reasonable, customers must "repeatedly [engage in] business dealings with" the employer based on the "the influence an employee acquires over his employer's customers through personal contact." *Whelan*, 379 S.W.3d at 842.

8. But, where sales in the industry tend not to result from "an employee's ability to influence customers," but instead from pricing or other considerations, the employer can have no protectable interest in customer contacts. *Whelan*, 379 S.W.3d at 842; *see also Easy Returns Midwest, Inc.*

*v. Schultz*, 964 S.W.2d 450, 454 (Mo. Ct. App. 1998). Here, the undisputed evidence establishes the distribution industry in which Vertiv, xpedx and Midland operate is characterized by intense price competition for fungible products offered by many distributors. The customer declarations, Doc. 49, document that customers purchase from multiple paper and packaging supplies distribution companies, and they base purchasing decisions principally on price. The purchasers in this market are not retail customers, but are sophisticated commercial buyers who regularly do business with multiple distributors offering the same products, and which seek competitive quotes for products from competing distributors, ultimately purchasing from the distributor offering the lowest price and/or most favorable terms on a given bid. *See* Doc. 49. The evidence shows customers in this industry make purchasing decisions primarily on pricing and delivery terms, not goodwill developed between any particular distributor as compared to another, Counterclaim / Third Party Plaintiffs cannot carry its burden that the noncompetition agreements at issue are justified by a protectable interest in its customers.

9. Counterclaim / Third Party Plaintiffs conceded at the hearing and the Court agreed that trade secrets are not at issue here. The Court finds Counterclaim / Third Party Plaintiffs would be unable to show a protectable interest in any confidential information they provided to its sales

professionals. To qualify as a trade secret, the information must be "a process or device for continuous use in the operation of the business" whose disclosure would "give the new employer a competitive advantage over the former employer." *Brown*, 291 S.W.3d at 779. But evidence demonstrates the information Counterclaim / Third Party Plaintiffs identify as its trade secrets — its pricing and customer information —is generally known in the trade and pricing is constantly changing. Missouri law establishes that protectable trade secrets must be more than "simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid." *Brown*, 291 S.W.3d at 779. "[C]onfidential, but short-lived, information" like the pricing information here "is not a trade secret is because once it expires, it has no value to a competitor." *Id*. Further, the record shows that neither purchasers nor suppliers in this industry are bound by nondisclosure agreements, and they share pricing, requirements and product information with competing distributors in the normal course of business.

10. Entry of a preliminary injunction here would harm the public interest because doing so would suppress competition in the marketplace, thereby harming non-party purchasers and consumers for no lawful reason.

11.     For all of the above-stated reasons, the evidence presented does not support the imposition of a preliminary injunction.

### IV.  Conclusion

Accordingly, the Court DENIES Counterclaim / Third Party Plaintiffs' Motion for Preliminary Injunction (Doc. 23).

**IT IS SO ORDERED.**

Signed this 24th day of November, 2014.

Digitally signed by
David R. Herndon
Date: 2014.11.24
14:06:11 -06'00'

**District Judge**
**United States District Court**